## BURBRIDGE REALTY COMPANY, etc., v CRAVEY and ARMS CORP., etc.

## Case No. 85-7219-CA

Fourth Judicial Circuit, Duval County

June 9, 1986

## APPEARANCES OF COUNSEL

**Edward A. White** for plaintiffs.

**B. Thomas Whitefield** for defendants.

## OPINION OF THE COURT

A.J. SOUD, JR., Circuit Judge.

This cause came on for trial without jury on May 29, 1986.

The Plaintiffs were represented by Edward A. White, Esquire, and the Defendants by B. Thomas Whitefield, Esquire.

In this Final Judgment, the Plaintiffs will be referred to as "BUR-BRIDGE" and the Defendants herein as "ARMS" to facilitate findings, conclusions, and opinion.

Testimony and exhibits were received into evidence. Arguments of counsel were heard. All has been duly considered and weighed.

From the evidence, the Court makes the following essential findings of fact.

### ESSENTIAL FACTS

BURBRIDGE as landlord-lessor leased its premises consisting of two separate offices to ARMS. At inception, the written lease (Plaintiffs' Exhibit #1) was for a six-month term from February 1, 1983, through July 31, 1983, for 1124 South Edgewood Avenue. On June 1, 1983, ARMS negotiated to lease the adjacent space at 1120 South Edgewood Avenue and the latter space was thereupon included within the lease terms for the new twelve-month period from August 1, 1983, to July 31, 1984 (Plaintiffs' Exhibit #2). The lease permitted an annual adjustment to the rental rate in accordance with the Consumer Price Index compiled by the U. S. Bureau of Labor Statistics. The lease permitted either party to terminate with 60 days advance notice in writing. ARMS leased the premises in "as is" condition.

Before ARMS made improvements, the premises were air conditioned and partitioned. 1120 had old carpet and 1124 was furnished with old vinyl tile flooring. The office space had evidence of roof leaks because of water stains in the tile ceiling. The interiors were musty and needed a cosmetic dress-up. The lease terms were not negotiated to conclusion until BURBRIDGE gave its approval to ARMS for tenant improvements. No meeting of the minds ever occurred as to the intention of BURBRIDGE to pay for same or credit the expense of same to ARMS' rental. ARMS installed interior wall partitions with electrical wiring and outlets, a drop ceiling, exterior wall paneling, air

**25**

condition and heat duct work, and new carpeting in 1120, and with costs exceeding $7,200.00. Subsequently, ARMS requested payment or credit from BURBRIDGE for the improvements. Except for an $800.00 compressor installed by ARMS, BURBRIDGE never paid or credited ARMS for same.

The lease expired on July 31, 1984; however, ARMS physically stayed over through October 31, 1984. On September 4, 1984, BUR-BRIDGE wrote a letter to ARMS (Plaintiffs' Exhibit #11), setting forth the twelve-month increase of 4.1% according to the Consumer Price Index figures which increased the rent from $563.33 to $586.43 per month with an additional retroactive adjustment to the August, 1984, monthly period. ARMS concurred and acquiesced to the written terms of BURBRIDGE'S letter of September 4, and paid the increased rent for August, September, and October. On September 25, 1984, ARMS sent its 60-day notice, in writing, to terminate the lease effecting October 31, 1984 (Plaintiffs' Exhibit #6). At inception of the lease, ARMS had paid a last month's rent of $550.00.

ARMS vacated the premises between October 1 and October 15, 1984, when it authorized its project manager to supervise a crew that would dismantle the improvements therein. The dismantling process covered a period of five days. BURBRIDGE had no access whatsoever to the premises prior to October 31, 1984. The key in its possession furnished by ARMS was unusable because ARMS had changed all locks. ARMS was in control and possession of the premises, though not physically present, through October 31. Said lease did not expire on October 31 but November 30, 1984. On November 3, 1984, the first working day following ARMS' vacating of the premises, BURBRIDGE reentered and discovered that all improvements made during the tenancy had been removed by ARMS, namely: the drop ceiling had been removed, leaving exposed the underlying 15-year ceiling with numerous holes and missing tiles produced by ARMS, together with loose electrical wiring for fixtures and outlets; the paneling on the exterior walls was unsightly because of the space between the top of the paneling and the older ceiling caused by the removal of the drop ceiling; the carpeting in 1120 which had been laid after the placement of the interior partitions was unusable because of the removal of the interior partitions; the majority of the duct work had been dismantled and removed, leaving the remaining portion in shambles, disjointed, and of no use; the electrical wiring afforded no functional service to the premises; and, a large amount of trash, evidencing the dismantling of the premises, was stacked to the rear of the property.

As installed by ARMS, the partitions in 1124 were adequate for

26

future use by BURBRIDGE; however, a portion of the interior partitions in 1120 was not adequate to future use by BURBRIDGE because private office spaces were too small.

Subsequently, on March 1, 1985, BURBRIDGE re-leased the premises to a law firm which required customizing the interior to the needs and purposes of the new tenants. However, some of the improvements required greater expenditures by BURBRIDGE for portions of the damaged freehold caused by ARMS. ARMS did not leave the premises in as reasonably a functional facility as when it took possession. BURBRIDGE was deprived of an adequate ceiling, a portion of the interior walls, the ability to produce and distribute hot and cool air to the property, and the ability to provide reasonable electric service for the tenant. BURBRIDGE expended $1,420.00 for a replacement ceiling, $3,619.00 for interior partitions, of which it is entitled to recover one-half (ARMS, upon entry to the premises, removed what interior walls were there.); $1,400.00 for air conditioning and heating repairs, of which it is allowed to reocver $1,000.00, to restore the unit to the capability of delivering and returning conditioned air; and, $2,475.00 for electrical wiring and fixtures to restore the premises to the capability of reasonable use from a lighting and outlet viewpoint. Although claimed by BURBRIDGE, it suffered no consequential damages to the exterior walls, carpeting, portions of replacement to the interior partitions, or the heating and cooling system for reasons hereafter explained.

## CONCLUSIONS OF LAW

I. The September 4, 1984, letter from BURBRIDGE to ARMS setting forth the twelve-month increase in the Consumer Price Index for rents acquiesced in and utilized by ARMS to pay the increased rental for August, September, and October, 1984, is a "further instrument in writing" as required by Section 83.04, Florida Statutes, to bind the tenant to a renewal of the lease and subject to its terms. With the requirement of a 60-day notice to terminate, ARMS was obligated for rent to BURBRIDGE through November 30, 1984. Credited with its $550.00 deposit as a last month's rent, ARMS owes $36.43.

II. Improvements made by ARMS to the ceiling, interior partitions, heating and air conditioning system, and electrical services were annexed to the realty, appropriate to the use or purpose of the realty to which they were connected and were intended by ARMS to be a permanent accession to the freehold. *Wetjen v. Williamson*, 196 So.2d 461 (Fla. 1st DCA 1967). These improvements could not be removed without material and substantial injury to the freehold. *Dependable Air*

27

*Conditioning and Appliances, Inc., v. Office of Treasurer and Insurance Commissioner,* 400 So.2d 117 (Fla. 4th DCA 1981).

III. ARMS is obligated to reimburse BURBRIDGE for residual damages caused by its removal of fixtured, non-trade improvements to the realty in view of the fact that BURBRIDGE sustained this damage to the remaining structure.

## OPINION

This dispute is between two real estate management firms fully versed and educated in the area in which they have found conflict.

BURBRIDGE'S letter of September 4, 1984 (Plaintiffs' Exhibit #11), is a sufficient instrument in writing to bind ARMS to the exercise of their option to renew inasmuch as the increased rental payments were ratified and paid by it for three months.

ARMS leased the premises on such monetary terms that would not contemplate BURBRIDGE assuming the costs of its improvements. This is supported by the fact that ARMS sought no meeting of the minds with BURBRIDGE prior to completion of the improvements regarding assurances of reimbursement from BURBRIDGE. ARMS expressed no genuine concern for reimbursement as early as June 23, 1983 (Plaintiffs' Exhibit #3), in which letter ARMS stated that "a great deal of money was spent to much increase the value of your property, which, of course, will benefit you and your partners for many years to come . . . . after all of the improvements and their related invoices are complete, I will notify you, and *hopefully*, you will be able to schedule a time to drop by, inspect the buildings, and *discuss* the credits with me." (Emphasis added.) ARMS went on to say that "I have enjoyed working with you thus far and appreciate your consideration and *patience* in regard to the changes that have been necessary for us to make." (Emphasis added.) ARMS did not even submit the invoices until six months later on December 23, 1983 (Plaintiffs' Exhibit #5). BURBRIDGE had previously rejected requests for credits toward improvements on 1120 and reiterated its position on 1124. ARMS took no real issue with BURBRIDGE'S denial of the request and laid no serious claim to the improvement credit (Plaintiffs' Exhibit # 9). One must also consider the compliance by ARMS with the terms of the lease as to the payment of all rent due through October 31, 1984, almost 18 months after the first improvements were installed, yet without being reimbursed for them.

Frankly, the Court feels that the dismantling and removing of fixtures was spiteful and not based on any bona fide legal claim.

The Court is fully aware of the rebuttable presumption that exists in law in favor of the right of a tenant to remove structures of articles it has placed on leased property for its own purposes. *Wetjen, supra.*

Certainly, BURBRIDGE is not entitled to a windfall or the value of improvements for which it neither bargained, paid for, or owned and possessed greater than what it did at the inception of the lease. However, BURBRIDGE could fully expect that its premises would be vacated under such circumstances that they were not damaged and therefore fully available to be re-leased to another tenant without the expenditure of sums for repairs, replacement, or restoration which BURBRIDGE could amortize in the lease payments. BURBRIDGE is entitled, in negotiating with any tenant, to include within the rental rate such sums as would justify its expenditure of monies for improvements that it may be called upon to expend by virtue of the lease agreement. Improvements of the nature made herein could not fully benefit BURBRIDGE because of the substantial improvements and/or changes that would be made to the realty to make the needs of any future tenant as was done in that case.

BURBRIDGE would have suffered no loss or damage if ARMS had left intact the ceiling and the interior partitions. Those two items were the genesis of this dispute. The partitions had been affixed by screws to the floor although they were T-structured and not load-bearing. The removal of the ceiling affected the exterior walls, duct work, air condition and heating, and electrical service. The removal of the interior partitions affected the electrical wiring, available outlets, carpet, and duct work.

The Court is aware of no case in Florida where anchored interior walls and a secured drop ceiling have been held to be trade fixtures and therefore removable. Prior to the lease herein, BURBRIDGE had premises which were air conditioned and electrically serviced. When ARMS vacated, they left a premises that had no ceiling, no electrical service for use, and an air conditioning and heating system in disrepair.

The claim of the Plaintiffs to exterior wall damage is without merit inasmuch as the drop ceiling, once replaced, would restore the exterior walls to their use. The Plaintiffs suffered no damage with regard to the carpeting in 1120 inasmuch as it was totally unusable for new space once the premises was remodeled for a new tenant. Prior to the lease, the premises had interior partitions available for some modified use. When ARMS left, there were none. The allowances to BURBRIDGE for dismantling and removing them will be for one-half the amount claimed. BURBRIDGE'S claim to compensation for the damaged air

**29**

and heating system has merit. It is not entitled to damages for the restoration of the system suitable for the new tenants; however, BURBRIDGE was entitled to have a cooling and heating system capable and adaptable for future use as it did at the inception of the lease together with the restoration of the unit and partial duct work.

The thrust of ARMS' contention that the damage was caused the premises by intrusion of third persons is without any reasonable basis in evidence, particularly so when BURBRIDGE was denied access to the premises, and ARMS held actual possession through October 31, and had lease obligations through November 30, 1984, and actual possession and control through October 31, 1984.

ARMS' own project manager testified that when dismantling was complete the said strips were intact, the main intake and return duct was intact, the door and wiring to the heating and air conditioning unit and room were intact, and the electricity connections were either tied or boxed. The record is undisputed that upon reentry, BURBRIDGE found damage to all of the items, all of which occurred during ARMS' possession and control.

Upon consideration of the foregoing, it is, thereupon,

ORDERED AND ADJUDGED:

1. That the Plaintiffs, BURBRIDGE REALTY COMPANY, a Florida corporation, and BEN BURBRIDGE, do have and recover from the Defendant, ARMS CORP. OF JACKSONVILLE, a Florida corporation, the sum of $6,750.88 with interest accruing at the statutory rate, for which let execution issue.

2. That the Plaintiffs, BURBRIDGE REALTY COMPANY, a Florida corporation, and BEN BURBRIDGE, take nothing by this action against the Defendant, JERRY R. CRAVEY, and said Defendant goes hence without day.

3. The Court reserves jurisdiction to assess and award costs in favor of the Plaintiffs, BURBRIDGE REALTY COMPANY, a Florida corporation, and BEN BURBRIDGE, and against the Defendant, ARMS CORP. OF JACKSONVILLE, a Florida corporation.

DONE AND ORDERED in Chambers, at Jacksonville, Duval County, Florida, this 9th day of June, 1986.